## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| Richard Valle and Manuel Colon | Case No: 3:22-cv-17250 |
| *Plaintiffs,* | |
| *v.* | |
| 3M Company | Judge |
| | Magistrate |
| *Defendants.* | |

## COMPLAINT AND PRAYER FOR PERMANENT INJUNCTION

1.     Plaintiffs, Richard Valle and Manuel Colon, by and through undersigned counsel, respectfully file this Complaint against Defendant 3M Company ("3M") for violations of the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Rev. Stat. § 726.101, *et seq*. Plaintiffs are creditors under FUFTA and seek a permanent injunction pursuant to FUFTA § 726.108(1)(C)(1) preventing 3M from executing fraudulent transfers. Plaintiffs request this relief for two specific reasons.

2.     First, 3M has undertaken a two-step scheme to delay and deprive Plaintiffs of their amounts owed, and to defraud them, as prohibited by FUFTA § 726.105(1)(a). 3M executed this scheme through the planned spin-off of its healthcare business announced on the very same day that it placed its Aearo

subsidiaries ("Aearo Debtors")[1] into bankruptcy.  Through this two-part scheme, 3M has demonstrated an "intent to hinder, delay, or defraud" Plaintiffs by stopping the MDL and delaying any payments to Plaintiffs, and the Court should therefore enjoin the fraudulent transfer of 3M's healthcare spin-off.

3.      Second, 3M's plans to spin-off its healthcare assets and give away billions of dollars to shareholders through stock repurchases and dividend payments are prohibited fraudulent transfers under FUFTA § 726.106(1) because they will leave 3M insolvent if consummated and/or will leave 3M with unreasonably small assets in relation to 3M's business under FUFTA § 726.105(1)(b).  Injunctive relief is therefore necessary to stop 3M from gifting billions of dollars to its shareholders to the detriment of innocent tort victims, like Plaintiffs.

## THE PARTIES

4.      Plaintiff, Richard Valle, is a citizen of San Diego County, California and a creditor of 3M under FUFTA.

5.      Plaintiff, Manuel Colon, is a citizen of Orange County, Florida and a creditor of 3M under FUFTA.

6.      Defendant 3M is a Delaware corporation with its principal place of

---

[1] The Aearo Debtors are those entities that filed for bankruptcy in *In re Aearo Technologies LLC, et al.*, 22-0890-JJG-11 (Bankr. S.D. Ind.).  These entities include Aearo Technologies LLC, Aearo LLC, Aearo Intermediate LLC, Aearo Holding LLC, Aearo Mexico Holding Corp., Cabot Safety Intermediate LLC, and 3M Occupational Safety LLC.

business in Minnesota.  Defendant 3M is a citizen of Delaware and Minnesota for diversity of citizenship purposes.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity among Plaintiffs and Defendants, *see supra* ¶¶ 4-6, and as explained in further detail below, the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has *in personam* jurisdiction over the parties, as the Plaintiffs are both plaintiffs in the multidistrict litigation, *In Re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885 ("MDL" or "3M MDL"), which is pending in the Northern District of Florida before the Honorable Casey Rodgers, and Plaintiffs' status as FUFTA creditors of 3M as well as their FUFTA claims directly arise out of 3M's status as a defendant in Plaintiffs' MDL actions.

9.     This Court also has *in personam* jurisdiction over 3M because its fraudulent transfers that are the subject of this Complaint, *see infra* 33-41, 65-85—including but not limited to stock dividends, stock repurchases, and transfers of stock in connection with a spin-off transaction, are transfers that are directed at Florida and specifically, upon information and belief, to 3M shareholders who reside in the Northern District of Florida.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2)

because this case is related to and arises out of Plaintiffs' claims against 3M in the 3M MDL, which is pending in this district, and because 3M plans to improperly disperse a substantial amount of property to shareholders in this judicial district.

## FACTUAL BACKGROUND

11.    Plaintiffs are former United States military servicemembers who have suffered injuries from their use of the Combat Arms Version 2 earplugs ("CAEv2").

12.    3M sold and manufactured the defective CAEv2 to the military for sixteen years.

13.    On April 3, 2019, the Judicial Panel on Multidistrict Litigation ("JPML") consolidated all claims arising out of allegations that the CAEv2 "were defective, causing plaintiffs to develop hearing loss and/or tinnitus."

14.    For three-and-half years, the Court presiding over the 3M MDL ("MDL Court") has skillfully managed the 3M MDL to an advanced stage in record time.

15.    The MDL Court selected twenty-seven bellwether cases, resulting in sixteen trials and nineteen individual verdicts; and oversaw the preparation of nearly 1,500 cases for trial following remand (the "Wave Cases").

16.    In the MDL, there are twenty-seven bellwether plaintiffs, nineteen of whom have proceeded to trial.

17.    Of the nineteen bellwether cases that have gone to trial, juries have returned verdicts in thirteen cases in favor of plaintiffs and six cases in favor of 3M.

18.     Eight bellwether plaintiffs dismissed their cases prior to trial.

19.     The average bellwether verdict for the nineteen cases that have proceeded to trial is $13,979,836.00

20.     Taking into account the eight bellwether cases that were dismissed prior to trial (and generously considering them to be defense verdicts), as well as the Court's post-trial reductions of any verdicts, the average bellwether verdict for all twenty-seven bellwether cases is $9,837,662.16.

21.     The Court, with the assistance of BrownGreer, ran analytics on the entire plaintiff population to ensure that the bellwether pool for the 3M MDL was truly representative of the claimants in the MDL.

22.     3M agreed with and approved this process: "Defendants believe the Court has followed an appropriate path in overseeing the selection of 25 bellwether case candidates who in turn will be subject to random selection for bellwether trials." MDL Dkt. 1123 at 2.[2]

23.     Following the conclusion of the last bellwether trial, the MDL Court tellingly concluded that "16 bellwether trials and 19 verdicts have provided unparalleled insight into the strengths and weaknesses of the various claims and defenses *and how juries respond to the evidence*, all of which has clearly informed

---

[2] After 3M made this statement, the MDL Court selected additional bellwether cases to bring the number of cases to 27.  *See* MDL Dkt. 1286.

the parties of the risks and costs associated with the litigation." MDL Dkt. 3188 (emphasis added).

24.    There are approximately 220,000 claimants currently in the 3M MDL.

25.    Based on the MDL Court's thoughtful bellwether selection process, the bellwether cases in the 3M MDL are representative of the approximately 220,000 veterans who continue to litigate against 3M.

**3M devised a restructuring scheme to delay and hinder the CAEv2 lawsuits while it transfers assets into a new corporate form.**

26.    Several months before the Aearo Debtors declared bankruptcy, "3M and Aearo devised a scheme to escape the MDL and this Court for good." MDL Dkt. 3386 at 6.

27.    The first step of this scheme was to exploit the bankruptcy system to stop the CAEv2 lawsuits pending in the MDL Court, with the specific goal of delaying the Wave Cases, including Mr. Valle's and Mr. Colon's cases, many of which were on the verge of trial.

28.    To do this, while not filing for bankruptcy itself, 3M executed a circular agreement with its subsidiaries, the Aearo Debtors, (the "Funding Agreement") pursuant to which 3M agreed to fund the Aearo Debtors' operations and capital needs while the Aearo Debtors pursued Chapter 11 bankruptcy.

29.    In exchange, the Aearo Debtors purported to indemnify 3M (using only 3M's money) for all of the CAEv2 claims and, it is now clear, agreed to use the

6

bankruptcy to help 3M disrupt the MDL.

30.    The Funding Agreement was crafted with the purpose of halting the 3M MDL and potential payments to creditors like Plaintiffs.[3]

31.    Prior to the Funding Agreement, the Aearo Debtors faced no liability from the 3M MDL because, throughout the 3M MDL, Aearo has been "a party to th[e CAEV2] litigation in name only." MDL Dkt. 3386 at 3.

32.    In sum, "the funding and indemnity agreement creates no value other than to mount 3M's escape from this MDL."  MDL Dkt. 3389 at 4, n.2.

33.    Step two of 3M's scheme was to use the delay caused by the Aearo bankruptcy to spin-off valuable assets into new corporate forms, where they would be sheltered from the CAEv2 creditors.

34.    On the same day that 3M announced the Aearo bankruptcy, *In re: Aearo Technologies LLC, et al.*, 22-2890 (Bankr. S.D. Ind.), it announced its plan to spin-off its healthcare businesses.

35.    In 3M's 8-K filing with the SEC to report the healthcare spin-off, 3M expressly noted that the transaction would separate the healthcare businesses from 3M's liability for tort claims.

---

[3] Plaintiffs' Complaint does not ask this Court to enjoin or interfere with 3M's performance under the Funding Agreement in any way; they describe the Funding Agreement here because its operation is part of the evidentiary record that demonstrates the intent behind 3M's broader scheme.

36.    In 3M's earnings call with investors on the day of the Aearo bankruptcy and healthcare spin-off, 3M represented to investors that both the bankruptcy and the healthcare spinoff were part of a strategy to "driv[e] long term value for shareholders."

37.    The healthcare spin-off would place 3M's healthcare business in a separate corporate form.

38.    3M's healthcare business had $8.61 billion in sales in 2021—over a quarter of 3M's total sales—and represented an even greater share of 3M's total value given the market's valuation of healthcare assets.

39.    Analysts have valued the healthcare business at between $30 billion and $46 billion, comprising up to 41% of 3M's existing market value.

40.    In performing this spin-off, 3M will move tens of billions of dollars' worth of assets and revenue into new corporations and receive *nothing* in exchange.

41.    On information and belief, 3M management told industry analysts that it believed the spinoff would have the effect of sheltering 3M's healthcare assets from the Company's tort liabilities.  Analysts have told investors that the spinoff would have this effect.

**3M faces insolvency under FUFTA.**

42.    Under FUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  FUFTA § 726.103(1).

43.    This definition of insolvency is commonly referred to as the "balance sheet test."

44.    FUFTA defines "debt" broadly to capture obligations created by the debtor's tortious conduct.  "Debt" means "liability on a claim," and a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  FUFTA § 762.102(4) & (7) (emphasis added).

45.    As with any other contingent liability, the fair value of pending tort claims depends upon the legal merits of the underlying litigation and the provable damages for the harm the debtor inflicted.

46.    Because the bellwethers are representative of the total population of remaining plaintiffs, the average verdict is an appropriate estimate of each plaintiff's claim value.

47.    Even assuming a range of reasonable claim values to account for sample size and chance, 3M's CAEv2 liabilities are massive.

48.    For instance, even if one attempts to account for random variations between the total population of CAEv2 claimants and the bellwether cases, Plaintiffs can say with 99% confidence that the CAEv2 plaintiffs will prevail in no fewer than 23.8% of future cases.

49.     The actual win percentage will almost certainly be higher and would be lower only .5% of the time.

50.     Instead of using the average value of the bellwether cases, one could skew the analysis in 3M's favor by using a range of the average of the four lowest verdicts, $1.79 million, and the fourth lowest verdict of $2.42 million

51.     Still further, instead of using the number of claimants as of June 10, 2022, approximately 233,000,[4] one can further lower the number of claimants by the same percentage of claimants who dropped their claims from September 2021 (282,902) to June 2022 (233,883), a 17.3% decline.

52.     Based on these assumptions in 3M's favor, 3M's liability from the CAEv2 claims ranges from $82.2 billion to $111.2 billion.

53.     3M cannot seriously hope that these wildly generous assumptions will come to pass.  To date, 86% of plaintiffs have voluntarily transferred their cases to the MDL docket and paid the requisite filing fee, MDL Dkt. 2953, and more than 50% of the bellwether cases that have gone to trial have resulted in plaintiff verdicts.

54.     3M is insufficiently capitalized to carry such a heavy debt load if it is permitted to further give away its assets to shareholders in exchange for nothing in

---

[4] Since June 10, 2022, the Court has dismissed without prejudice approximately 13,000 cases. *See* MDL Dkt. 3340, 3345, 3346, 3349.  The analysis contained herein still assumes the number of claimants well below the current case count and is therefore unaffected if based on the June 10, 2022 claimant numbers.

return.

55.    At a minimum, 3M will become insolvent if it effectuates its planned

transfers, described *infra* 65-85, to shareholders.

**Any transfers 3M makes for less
than "reasonably equivalent value," such as dividends
or stock repurchases, are prohibited fraudulent transfers under FUFTA.**

56.    Under FUFTA, "[a] transfer made or obligation incurred by a debtor is

fraudulent as to a creditor whose claim arose before the transfer was made or the

obligation was incurred if the debtor made the transfer or incurred the obligation

without receiving a reasonably equivalent value in exchange for the transfer or

obligation and the debtor was insolvent at that time or the debtor became insolvent

as a result of the transfer or obligation."  FUFTA § 726.106(1).

57.    A transfer is also fraudulent under FUFTA "if the debtor made the

transfer or incurred the obligation without receiving a reasonably equivalent value

in exchange for the transfer or obligation, and the debtor was engaged or was about

to engage in a business or a transaction for which the remaining assets of the debtor

were unreasonably small in relation to the business or transaction."  FUFTA §

726.105(1)(b).

58.    A "'[t]ransfer' means every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with an asset or an

interest in an asset, and includes payment of money, release, lease, and creation of a

lien or other encumbrance." FUFTA § 726.102(14).

59.    "Value is given for a transfer . . . if . . .  property is transferred or an antecedent debt is secured or satisfied . . . ." FUFTA § 726.104(1).

60.    Spin-offs, dividends, and stock repurchases that leave a company unable to pay its liabilities are quintessential fraudulent transfers.

61.    A dividend payment from 3M to its shareholders is a distribution of cash to 3M shareholders, and 3M does not receive *any* value or consideration in return for a dividend payment.

62.    Stock repurchases are treated the same way as dividends.

63.    With asset spin-offs, 3M spins off assets to a new company owned by its shareholders.

64.    3M's healthcare spin-off, discussed in more detail *supra* 33-41, effectively removes assets from 3M without reasonably equivalent value in return or any consideration whatsoever.

**3M will make fraudulent transfers prohibited by
FUFTA because the transactions will render 3M insolvent,
or at the very least, 3M will be left to operate with unreasonably small capital.**

65.    As described *supra* 33-41, 3M is currently undertaking the spin-off of its healthcare business.

66.    The spin-off should be completed by the end of 2023.

67.    3M has engaged in a course of regular dividends and stock repurchases.

68.     3M has already announced plans to issue a dividend of $1.49 per share on September 12, 2022.

69.     On June 12, 2022, 3M paid a dividend to its shareholders of the same amount, $1.49 per share, which was a 1% increase over the dividend paid in the same quarter last year.

70.     3M has about 569.1 million shares outstanding, so the total payment for its last quarterly dividend was some $850 million and will be the same for the September 12, 2022 dividend.

71.     3M paid the same dividend, of $1.49 per share, on March 12, 2022, also totaling some $850 million.

72.     During the 2021 fiscal year, when 3M was already on notice of the claims in this litigation, 3M paid $3.420 billion in dividends.

73.     3M "has paid dividends to its shareholders without interruption for more than 100 years and increased the annual dividend for 64 straight years."  3M Investor Relations, Stock Information 2022, *available at* https://investors.3m.com/stock-information/dividends/default.aspx.

74.     Absent an injunction from this Court, 3M will continue to pay dividends.

75.     3M also spent $2.2 billion in stock repurchases during the 2021 fiscal year, when it was on notice of the claims in the 3M MDL.

13

76.     In November 2018, 3M authorized $10 billion in stock repurchases and has spent $5.243 billion thus far on stock repurchase since that authorization, leaving $4.757 billion for 3M to siphon away from its creditors.

77.     In the first half of 2022, 3M's dividends of $1.7 billion plus its net share repurchases of $546 million—payouts totaling $2.246 billion—were more than 168% of its available free cash flow.

78.     As of June 30, 2022, due to 3M's aggressive dividend payments and stock repurchases, 3M reported a balance of cash and marketable securities of just $2.98 billion, compared with $4.76 billion as of year-end 2021.

79.     In fact, in the seven calendar years from 2015 through 2021, 3M paid out an average of 100% of its free cash flow as dividends and net share repurchases (share repurchases net of share issuances) with a median annual payout of 85% of its free cash flow.

80.     3M is giving shareholders more than it generates in operating cash, leaving the company with precariously low liquidity given its staggering level of debt.

81.     3M had $5.85 billion of free cash flow for 2021, and the likely minimum value of the 3M CAEv2 claims—approximately $82 billion to $111 billion—represents 14 to 19 times 3M's current annual free cash flow even if 3M held all of that free cash flow for payment of the 3M CAEv2 claims.

82.     In addition to the 3M CAEv2 claims, however, 3M also has more than $30 billion of other liabilities reported on its public financial statements, including more than $16 billion of debt as of June 30, 2022.

83.     These disclosed liabilities may not adequately account for other litigation liabilies 3M has to non-CAEv2 tort claimants (e.g. PFAs claims).

84.     3M's spin-offs, dividends, and stock repurchases, will render 3M insolvent.

85.     At the very least, based on the fact that 3M has averaged payout of 100% of its free cash flow as dividends and share repurchases since 2015 (with a median annual payout of 85%) and based on the fact that 3M is engaged in spinoffs of substantial parts of the existing business that generates that free cash flow, 3M is operating with unreasonably small assets in relation to its liabilities under its current course of dividend payments, stock repurchases, and corporate spin-offs and will not have the ability "to generate enough cash from operations and sales of assets to pay its debts and remain financially stable after [its proposed] transfer[s]." *In re Jackson*, 459 F.3d 117, 123 (1st Cir. 2006).

**Plaintiffs, and thousands of other claimants in the 3M MDL, will be injured by 3M's fraudulent transfers.**

86.     Under FUFTA, a "creditor" is defined as "a person who has a claim," FUFTA § 726.102(5), and a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," FUFTA § 726.102(5)(4) (emphasis added).

87.    Mr. Valle is a Wave 1 plaintiff in active litigation against 3M for his claims arising out of the defective CAEv2, and although his case has not been set for trial, the parties have submitted dispositive and *Daubert* briefing and are awaiting rulings from the MDL Court, after which his case will promptly be set for trial. *Valle v. 3M Co., et al.*, 7:20-cv-75821.

88.    Mr. Colon is a Wave 2 plaintiff in active litigation against 3M for his claims arising out of the defective CAEv2, and although his case has not been set for trial, the parties have completed fact discovery and Mr. Colon has submitted his expert report to 3M.  *Colon v. 3M Co., et al.*, 7:20-cv-59652.

89.    Plaintiffs are therefore both contingent creditors of 3M under FUFTA.

90.    If 3M continues to make fraudulent transfers, in the form of dividend payments, stock repurchases, asset spin-offs, asset split-offs, or otherwise, 3M will continue to siphon off billions of dollars from creditors like Plaintiffs.

91.    If 3M is allowed to implement its policy of draining assets through the fraudulent transfer of billions of dollars, Plaintiffs—and thousands of other innocent claimants—will likely never receive the money owed to them under the law.

92.    To avoid this, Florida—like most states—adopted the Uniform Fraudulent Transfer Act ("UFTA"), which was designed to protect unsecured

creditors from debtors like 3M who deplete their estate to the detriment of creditors.

93.    In line with the UFTA, FUFTA recognizes the potential of such irreparable harm to innocent creditors like Plaintiffs and specifically provides for injunctive relief to halt fraudulent transfers by an entity facing insolvency, like 3M. *See* FUFTA 726.108(1)(c)(1).

## FIRST CAUSE OF ACTION – PERMANENT INJUNCTION FOR VIOLATION OF FUFTA § 726.105(1)(A)

94.    Plaintiffs hereby incorporate and re-allege paragraphs 1 through 95.

95.    FUFTA prohibits transfers made "with intent to hinder, delay, or defraud any creditor."  FUFTA 726.105(1)(a).

96.    As described *supra* 26-41, 3M engaged in a two-part scheme to defraud CAEv2 claimants like Plaintiffs by (1) disrupting and delaying the MDL and (2) beginning a spin-off of 3M's healthcare businesses.

97.    FUFTA identifies a number of "badges" of fraud for courts to consider when assessing whether a debtor has acted with intent to "hinder, delay, or defraud."

98.    Through its two-part scheme, 3M's actions satisfy a number of badges.

99.    Three badges of fraud include, *inter alia*, transferring assets to an "insider," retaining possession or control of transferred property after the transfer, and transferring property after having been sued.

100.   Here, first, 3M entered the Funding Agreement with the Aearo Debtors, which are wholly owned subsidiaries of 3M and therefore the equivalent of insiders.

101. Second, the healthcare spin-off is little more than a formalism, transferring economic value from one corporate form to another—in an effort to wall off those assets from the CAEv2 claimants.

102. 3M will maintain a 19.9% ownership stake of the healthcare spin-off, with 3M's shareholders owning the rest.

103. Third, 3M formed the Funding Agreement and the healthcare spin-off when 3M was embroiled in extensive litigation and faced thousands of lawsuits from the 3M MDL.

104. As detailed *supra* 42-85, 3M will become insolvent if it effects the proposed spin-offs.

105. 3M and the Aearo Debtors have made clear they entered the Funding Agreement to facilitate the bankruptcy and move the CAEv2 claims out of the 3M MDL.

106. As a general matter, the timing and operation of the healthcare spin-off creates a strong basis for inferring that the spin-offs are being conducted to shelter 3M's assets from the CAEv2 claimants.

107. Taken together, these factors provide extensive evidence that 3M's bankruptcy and spin-off scheme reflect an "actual intent to hinder, delay, or defraud" creditors. FUFTA § 726.105(1)(a).

108. FUFTA specifically contemplates an injunction to stop fraudulent

transfers: "In an action for relief against a [fraudulent] transfer . . . a creditor, subject to the limitations in section 726.109, may obtain . . . An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." FUFTA § 726.108(1)(a).

109.    Plaintiffs will suffer irreparable injury if 3M completes its healthcare spin-off because Plaintiffs will be unable to collect on their claims against 3M.

110.    Hundreds of thousands of other innocent claimants will similarly be unable to collect their judgments from 3M absent judicial relief.

111.     The balance of hardships weighs in favor of Plaintiffs because it is unlawful for 3M to make fraudulent transfers under FUFTA.

112.    3M will not be harmed by an injunction because 3M will simply be required the status quo.

113.     The public interest is served with an injunction by preventing a company like 3M from dissipating its assets in order to not pay creditors, like Plaintiffs.

114.    The injunction will thus serve the purpose of FUFTA, and more broadly, the nationally embraced purpose of the UFTA.

115.    Thus, an order enjoining any future fraudulent transfers from 3M, such as the spin-off of 3M's healthcare business, is warranted and necessary under FUFTA.  FUFTA § 726.108(1)(a).

## SECOND CAUSE OF ACTION – PERMANENT INJUNCTION FOR VIOLATION OF FUFTA § 726.106 AND/OR § 726.105(1)(B)

116.   Plaintiffs hereby incorporate and re-allege paragraphs 1 through 117.

117.   Under FUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  FUFTA § 726.106(1).

118.   Under FUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  FUFTA § 726.103(1).

119.   Alternatively, under FUFTA, a transfer is fraudulent "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."  FUFTA § 726.105(1)(b).

120.   Even assigning all assumptions in 3M's favor, such as applying a low 23.8% victory rate for plaintiffs, using a range of the average of the four lowest verdicts, $1.79 million, and the fourth lowest verdict of $2.42 million, and reducing the claimants to 193,000, 3M faces a *minimum* range of liability from $82.2 billion

to $111.2 billion.

121.   As of June 30, 2022, 3M's assets were worth at most $73.64 billion based on its public market capitalization.

122.   3M will become insolvent if it proceeds with its planned fraudulent transfers through its healthcare spin-off, stock dividends, and stock repurchases.

123.   3M has made and will continue to make fraudulent transfers under FUFTA.

124.   3M has announced its plans for its healthcare spin-off.

125.   3M will not receive reasonably equivalent value for the healthcare spin-off because it will jettison assets in exchange for no value to 3M.

126.   3M has made and, absent judicial relief, will continue to make quarterly dividend payments, with the next payment occurring on September 12, 2022.

127.   Dividends are classic fraudulent transfers.

128.   3M has repurchased, and absent judicial relief, will continue to repurchase billions of dollars worth of its company stock every year.

129.   Stock repurchases of an insolvent company are, by definition, not for reasonably equivalent value because insolvent companies have no equity value.

130.   At the very least, under 3M's current plans for transactions, including the healthcare spin-off, stock dividends, and stock repurchases, 3M is operating with assets that are unreasonably small in relation to its liabilities and will not have the

ability to generate sufficient cash from operations and sales of assets to pay its debts and remain financially stable after these proposed transfers.

131.   These transactions are thus also fraudulent transfers under FUFTA § 726.105(1)(b) because the transfers will leave 3M with unreasonably small assets to operate.

132.   FUFTA specifically contemplates an injunction to stop fraudulent transfers: "In an action for relief against a [fraudulent] transfer . . . a creditor, subject to the limitations in section 726.109, may obtain . . . An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." FUFTA § 726.108(1)(a).

133.   Plaintiffs will suffer irreparable injury if 3M consummates its fraudulent transfers, including but not limited to, through its healthcare spin-off, the payment of dividends to 3M's shareholders, and the payment of stock repurchases, because those transactions will leave 3M insolvent and Plaintiffs will be unable to collect on their claims against 3M.

134.   Hundreds of thousands of other innocent claimants will similarly be unable to collect their judgments from 3M absent judicial relief.

135.   The balance of hardships weighs in favor of Plaintiffs because it is unlawful for 3M to make fraudulent transfers under FUFTA.

136.   3M will not be harmed by an injunction because 3M will be forced only

to keep billions of dollars of cash.  Retaining cash does not harm 3M. It can always pay dividends at a later date if it somehow reestablishes good financial health.

137.    The public interest is served with an injunction by preventing an insufficiently capitalized company like 3M from dissipating its assets and not paying its creditors, like Plaintiffs.

138.    The injunction will thus serve the purpose of FUFTA, and more broadly, the nationally embraced purpose of the UFTA.

139.    Thus, an order enjoining any future fraudulent transfers from 3M is warranted and necessary under FUFTA.  FUFTA § 726.108(1)(a).

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray that this Court enter judgment in their favor and against 3M and grant the following relief:

A. A permanent injunction pursuant to FUFTA § 726.108(1)(a) prohibiting 3M from transferring assets with the intent to hinder, delay, or defraud claimants in the MDL under § 726.105(1)(a), such as proceeding with the healthcare spin-off.

B. A permanent injunction pursuant to FUFTA § 726.108(1)(a) preventing 3M from executing any fraudulent transfers, as defined by FUFTA § 726.106 and/or § 726.105(1)(b), including through the payment of dividends and stock repurchases; proceeding with the healthcare spin-off; or in any other way

disposing of 3M's assets or property for less than reasonably equivalent value.

C. Attorneys' fees and costs incurred by Plaintiffs in connection with this litigation; and

D. Such other relief as the Court deems just and proper.

Dated: September 1, 2022        */s/ Ashley C. Keller*

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashleybarriere@kellerpostman.com
Frank G. Dylewski
frank.dylewski@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Warren Postman (Pro Hac Vice)
wdp@kellerpostman.com
1100 Vermont Ave. N.W., 12th Floor
Washington, D.C. 20005
Telephone: (202) 918-1870
Facsimile: (312) 971-3502

***Counsel for Plaintiffs Richard Valle and Manuel Colon***